UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

*Electronically Filed*

| | | |
|---|---|---|
| HEAVEN HILL DISTILLERIES, INC. | ) | |
| | ) | |
| PLAINTIFF | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 3:18-CV-556-DJH |
| | ) | |
| HEAVEN'S DOOR SPIRITS, LLC | ) | |
| | ) | |
| DEFENDANT | ) | |

**PLAINTIFF'S MEMORANDUM IN SUPPORT
OF MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff Heaven Hill Distilleries, Inc. ("Heaven Hill") has been selling American whiskeys and bourbons under the trademark HEAVEN HILL *since the end of Prohibition*. Thanks to the high quality of Heaven Hill's people and products, Heaven Hill's bourbons[1] and whiskeys have lined the shelves of liquor stores throughout the Commonwealth of Kentucky and the nation for over eighty years.  With its trademark as its foundation, Heaven Hill has grown into the largest independent family-owned and operated producer and marketer of distilled spirits in the United States and, according to industry analysts, the second largest holder of aging bourbon whiskey in the world, with an inventory in excess of 1,400,000 barrels.  [Exhibit 1 hereto, Decl. of Max L. Shapira ("Shapira Decl."), ¶ 6].

Just a few months ago a new competitor decided to splash into the bourbon and whiskey market.  It was certainly entitled to do so.  What it was not entitled to do, however, was use a

---

[1] Bourbon is a form of whiskey that is made in the United States with a mash bill (recipe) of at least 51% corn, among other requirements.  All bourbons and whiskeys are distilled spirits.  [Ex. 1 hereto, Decl. of Max L. Shapira ("Shapira Decl."), ¶ 7].  Any time the word "whiskey" is used in the singular in this brief (or elsewhere, for that matter) it necessarily encompasses bourbons.

name that would confuse consumers into thinking that its new whiskeys and bourbon were related to, or associated with, Heaven Hill.  Unfortunately that is exactly what Defendant Heaven's Door Spirits, LLC ("Heaven's Door") chose to do.  It named its new whiskeys and bourbon HEAVEN'S DOOR, and then put them on the very same shelves from which HEAVEN HILL has been continuously selling its whiskeys and bourbons since the Great Depression.

Believing the likelihood of confusion to be obvious, Heaven Hill asked Heavens' Door to cease and desist.  Heaven's Door refused, claiming confusion was unlikely.  Accordingly, Heaven Hill commissioned a scientific survey by preeminent trademark survey expert Hal Poret to see who was right.  Mr. Poret's survey revealed a 39% *net* confusion rate—meaning that almost four of every ten consumers who see Heaven's Door's new whiskeys and bourbon believe that they are related to, or associated with, Heaven Hill.  Based upon this scientific evidence, as well as other relevant evidence such as the strength of the HEAVEN HILL Mark, Heaven Hill respectfully moves this Court to enter a preliminary injunction bringing an immediate end to this infringement.  If Heaven's Door is allowed to continue on its current path, its conduct will irreparably injure Heaven Hill and further confuse the consuming public.

## FACTUAL BACKGROUND

Heaven Hill was founded by the Shapira family in Bardstown, Kentucky, shortly after Prohibition.  [*Id.* at ¶ 4].  At the time of its founding, Heaven Hill was as speculative a new business venture as the dot com start-ups of the 1990's—a company founded with no brands, no available stocks of whiskey, and no customers, all at the height of the Great Depression.  [*Id.* at ¶ 5].  Throughout eight decades of commitment to independence and family ownership, Heaven Hill has protected its storied history and its investment in the future of the industry and the Commonwealth, both of which are inextricably intertwined with the HEAVEN HILL trademark.  [*Id.* at ¶ 10].

2

A.    __Heaven Hill's Use of its HEAVEN HILL Mark.__

In addition to using Heaven Hill as its long-standing trade name, Heaven Hill is also the owner of the HEAVEN HILL trademark.  Heaven Hill has continuously used the HEAVEN HILL trademark, and related trademarks incorporating the HEAVEN HILL trademark (collectively the "HEAVEN HILL Mark"), in connection with the sale of whiskey since at least 1937.  [*Id.* at ¶ 8; *see also* Ex. 1 to Compl. [DN 1].  The chart below shows the numerous trademark registrations Heaven Hill holds for marks incorporating the HEAVEN HILL Mark:

| TRADEMARK | Serial No./ Reg. No. | Status/Key Dates | Full Goods/Services |
|---|---|---|---|
| OLD HEAVEN HILL (Stylized)  | RN: 355451 SN: 71400125 | Registered: March 15, 1938  First Use: July 14, 1937  Filed: November 24, 1937 | (Int'l Class: 049) whiskey |
| HEAVEN HILL | RN: 693986 SN: 72063234 | Registered: March 1, 1960  First Use: September 30, 1937  Filed: November 26, 1958 | (Int'l Class: 049) whiskey |
| AMERICAN WHISKEY COLLECTION HEAVEN HILL DISTILLERIES, INC. H H DISTILLERIES TRADEMARK and Design  | RN: 3875902 SN: 77899566 | Registered: November 16, 2010  First Use: September 9, 2009  Filed: December 22, 2009 | (Int'l Class: 33) whiskey |
| HS HEAVEN HILL SELECT STOCK and Design  | RN: 4495860 SN: 85772165 | Registered March 11, 2014  First Use: November 18, 2013  Filed: November 6, 2012 | (Int'l Class: 33) alcoholic beverages except beers |

| TRADEMARK | Serial No./ Reg. No. | Status/Key Dates | Full Goods/Services |
|---|---|---|---|
| HEAVEN HILL BRANDS and Design  | RN: 4770439 SN: 86452760 | Registered July 7, 2015<br><br>First Use: December 15, 2014<br><br>Filed: November 12, 2014 | (Int'l Class: 33) alcoholic beverages except beers |
| HEAVEN HILL DISTILLERY EST 1935 and Design  | RN: 5242398 SN: 86933996 | Registered July 11, 2017<br><br>First Use: March, 2017 (Int'l Class: 33,35)<br><br>First Use: December, 2016 (Int'l Class: 41)<br><br>Filed: March 9, 2016 | (Int'l Class: 33) alcoholic beverages except beers (Int'l Class: 35) retail store services featuring distilled spirits, gifts, and sundries (Int'l Class: 41) education and entertainment services, namely, operating a visitor center facility exhibiting the operation of a distillery |
| HEAVEN HILL INC. and Design  | SN: 87826002 | Published May 8, 2018<br><br>Filed: March 8, 2018 | (Int'l Class: 33) alcoholic beverages except beers |

[*Id.* at ¶ 11].

Over the past 30 years, Heaven Hill has built on its foundation of American whiskeys to become a broadly diversified supplier of whiskeys, liqueurs, vodkas, rums, and other spirits under the HEAVEN HILL Mark and other marks.  [Ex. 1, Shapira Decl., ¶ 12].  Heaven Hill is known for its HEAVEN HILL Kentucky straight bourbon whiskeys; moreover, Heaven Hill produces and markets a broad range of American whiskeys, including rye whiskey, wheat whiskey and blended whiskeys.[2]  [*Id.* at ¶ 12].  Heaven Hill currently produces and sells a series of HEAVEN HILL-branded whiskeys and bourbons, pictured here:

---

[2] "American whiskey" includes bourbon, rye, wheat whiskey, blended whiskey, and others.  [*Id.* at ¶ 13].



[*Id.* at ¶ 15].  Heaven Hill sells HEAVEN HILL-branded whiskey in all fifty states.  [*Id.* at ¶ 16].

Heaven Hill's brand portfolio also includes the world's second-largest selling bourbon, Evan

Williams® Bourbon; Elijah Craig® Small Batch Bourbon; and various other award-winning

bourbons and whiskeys:



[*Id.* at ¶ 17].

Heaven Hill produces and distributes these various whiskeys and bourbons alongside dynamic brands of other types of distilled spirits and alcoholic beverages, including Deep Eddy® Vodka; Lunazul® Tequila; and category leading brands Burnett's® Vodka, Christian Brothers® Brandy, Carolan's Irish Cream®, and Admiral Nelson's® Rums under the umbrella of HEAVEN HILL BRANDS®.  [*Id.* at ¶ 18].  Heaven Hill also produces and sells a number of distilled spirits and alcoholic beverages designed to fill growing segments of the on- and off-premise market, like Hpnotiq® Liqueur, Blackheart® Rum, Domaine de Canton®, and PAMA® Liqueur, under the umbrella of HEAVEN HILL BRANDS®.  [*Id.* at ¶ 19].

Heaven Hill receives ongoing nationwide, unsolicited media coverage, including press coverage about visiting the Heaven Hill Bourbon Heritage Center and the Heaven Hill Distillery. [*Id.* at ¶ 20].  In fact, the Heritage Center, which receives 65,000 visitors annually from around the country and the globe, was awarded the Visitor Attraction of the Year at Whisky Magazine's 2008 Icons of Whisky Worldwide Presentation in London.  [*Id.* at ¶ 21].  Heaven Hill has been, and continues to be, selected for numerous awards and accolades, including its HEAVEN HILL SELECT STOCK bourbon winning the silver medal for Double Barreled Bourbon at the 2017 World Whiskies Awards.  Heaven Hill also won Icons of Whiskey Distiller of the Year awards from *Whisky Magazine* in 2008, 2009, 2016, and 2017, and U.S. Whiskey Distiller of the Year award from *Whisky Magazine* in 2009.  [*Id.* at ¶ 22].

Because of its widespread, continuous, and exclusive use of the HEAVEN HILL Mark to identify Heaven Hill as the source of its distilled spirits, Heaven Hill owns valid and subsisting federal statutory and common law rights to the HEAVEN HILL Mark.

## B.     Heaven's Door's Use of the HEAVEN'S DOOR Mark.

In August 2017, Heaven Hill became aware of Heaven's Door's applications to register the HEAVEN'S DOOR Mark for use in connection with distilled spirits.  [*Id.* at ¶ 24].  At that time, each of Heaven's Door's applications were filed based on its intent to use the HEAVEN'S DOOR Mark and without further specification as to planned use.  [*Id.* at ¶ 25].  Given the mere intent-to-use nature of the trademark applications, Heaven Hill continued to monitor to determine if Heaven's Door would ever actually produce a product, and if so, what that product would be.  [*Id.* at ¶ 26].  In April 2018, Heaven Hill found certificates of label approval ("COLAs") issued by the Alcohol and Tobacco Tax and Trade Bureau demonstrating that Heaven's Door was launching a series of American whiskey products.  [*Id.* at ¶ 27].  Moreover, Heaven Hill saw that Heaven's Door's HEAVEN'S DOOR Mark was confusingly similar to the HEAVEN HILL Mark, in that the marks share an essentially identical first element ("HEAVEN") followed by a single-syllable, four-letter word ("HILL" and "DOOR"), both generally printed in stacked, block-script letters, resulting in similarities between the visual appearance, sound, and consumer connotation of the marks.  [*Id.* at ¶ 28].

Heaven Hill feared that consumers would be confused, and associate Heaven's Door's whiskey with Heaven Hill.  After all, Heaven's Door is not selling ice cream or pizza—it is selling whiskey that competes directly with Heaven Hill's whiskey in identical and overlapping trade channels.

Accordingly, on April 25, 2018, Heaven Hill's counsel sent a letter, attached hereto as Exhibit 2, to Heaven's Door demanding that it cease and desist use of the HEAVEN'S DOOR Mark.  [*Id.* at ¶ 29].  Heaven's Door responded on May 3, 2018, claiming that its use of the HEAVEN'S DOOR Mark would not confuse consumers, and advising that it would not cease

using the HEAVEN'S DOOR Mark.[3]  [*Id.* at ¶ 30].  Shortly thereafter Heaven's Door released its new line of whiskeys and bourbon into a number of markets across the country, including Kentucky.[4]

Within five days of receiving Heaven's Door's response letter, Heaven Hill had its attorney engage prominent consumer survey expert Hal Poret to conduct a scientific survey to see who was right.  [*Id.* at ¶ 31].  In order to determine whether the Heaven's Door name created a likelihood of confusion with Heaven Hill, Mr. Poret conducted a sequential lineup version of a "*Squirt*" format survey, which "is an attempt to replicate the marketplace process of advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses."  *See* 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:177 (5th ed.).  It is well accepted as a standard method for assisting likelihood of confusion in situations where, as here, the parties' products are directly competitive or sufficiently related or overlapping such that consumers would be reasonably likely to encounter both in close proximity in the marketplace.  [Ex. 3 hereto, Expert Report of Hal Poret ("Poret Report"), p. 7].

The result of such a survey is a "confusion rate," and courts have held that confusion rates between 25% and 50% are extremely solid support for a finding of likelihood of confusion. *See Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 466–67 (4th Cir. 1996) (survey results of

---

[3]  Heaven's Door labeled its May 5, 2018 response letter "Privileged Settlement Communication."  The letter, however, was neither privileged nor a settlement communication. The only message in the letter was that Heaven's Door would not cease its use of the HEAVEN'S DOOR Mark, and that it would "assert all available defenses and counterclaims." Nevertheless, as a result of the self-serving and improper label that Heaven's Door placed upon its response letter, Heaven Hill is not attaching it as an exhibit.

[4]  *See* Ben Sisario, *Bob Dylan's Latest Gig: Making Whiskey*, N.Y. TIMES (Apr. 28, 2018), https://www.nytimes.com/2018/04/28/business/media/bob-dylan-heavens-door.html  (stating products would be introduced "next month").

between 30% and 40% supported a likelihood of confusion, "but even if the true figure were only half of the survey estimate, actual confusion would . . . nevertheless exist to a significant degree"); *McNeil-PCC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198, 202–03 (E.D.N.C. 1995) (survey results of 28% and 21% supported a likelihood of confusion).

Other courts have found that when additional evidence is supportive, a confusion rate between 10% and 20% is strong enough.  *See Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (1987) (survey result of 10% supported a likelihood of confusion, despite some "ambiguity" in the questions); *Exxon Corp. v. Tex. Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (survey result of 15% constituted strong evidence of a likelihood of confusion); *NFL v. Governor of State of Del.*, 435 F. Supp. 1372, 1380-81 (D. Del. 1977) (survey result of 19% and 21% supported a finding of substantial confusion); *Jockey Int'l, Inc. v. Burkard*, No. 74 123 S., 1975 WL 21128, at *6 (S.D. Cal. Feb. 21, 1975) (survey result of 11.4% supported a likelihood of confusion when considered alongside additional evidence); *Grotian, Helfferich, Schultz, Th. Steinweg Nachf. v. Steinway & Sons*, 365 F. Supp. 707, 716 (S.D.N.Y. 1973) (survey result of 8.5% supported likelihood of confusion when considered alongside additional evidence).

Mr. Poret conducted his survey and found there to be a high likelihood of confusion between the HEAVEN'S DOOR name and Heaven Hill—"a net confusion rate of 39% in excess of the survey 'noise' or false positive level as measured through a Control Group."  [Ex. 3, Poret Report, p. 4 *et seq.*].  Mr. Poret's survey, which is described in detail in his August, 2018 report attached as Exhibit 3 hereto, scientifically confirmed what Heaven Hill suspected as a result of its wealth of experience in the whiskey industry—that a significant number of consumers are likely to associate Heaven's Door's whiskies and bourbon with Heaven Hill.   [*Id.*].

Accordingly, given this evidence, and Heaven's Door's inflexible position, Heaven Hill had no choice but to file this lawsuit to protect the valuable trademark that sits at the heart of its entire business.

## STANDARD

"The preliminary injunction serves an important purpose—'to allow a victory by [the plaintiff] to be meaningful.'" *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (citation omitted).  When considering a motion for preliminary injunctive relief, the Court must weigh the following factors:  "'(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" *Tumblebus Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir. 2005) (quoting *PACCAR, Inc. v. TeleScan Techs., L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003)).  The four considerations applicable to preliminary injunction decisions are to be balanced; they are not prerequisites to be met.  *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 400 (6th Cir. 1997).  "No single factor will be determinative as to the appropriateness of equitable relief." *Id.*

> For example, "a finding that the movant has not established a strong probability of success on the merits will not preclude a court from exercising its discretion to issue a preliminary injunction if the movant has, at minimum, 'show[n] serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued.'"

*Id.* at 399–400 (quoting *Gaston Drugs, Inc. v. Metro. Life Ins. Co.*, 823 F.2d 984, 988 n.2 (6th Cir. 1987)).  "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.  A party thus is not required to prove his case in full at a preliminary injunction hearing" *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## ARGUMENT

In this trademark infringement case, a victory by Heaven Hill will not be meaningful unless Heaven's Door is ordered to stop infringing upon the HEAVEN HILL Mark.  It should be ordered to do so immediately, because with each passing day of Heaven's Door's continuing infringement, Heaven Hill and its valuable trademark are irreparably injured.  Heaven Hill's likelihood of success is high, and the requested injunction will cause no harm to Heaven's Door, as any self-inflicted wound caused by infringement does not weigh against issuance of an injunction.  The public interest is also served by the requested injunction, as it eliminates the confusion caused by Heaven's Door's infringement.  The four injunction factors weigh strongly in Heaven Hill's favor, and warrant issuance of the preliminary injunction.

### I.      HEAVEN HILL IS LIKELY TO SUCCEED ON THE MERITS.

Courts in the Sixth Circuit evaluate likelihood of confusion cases using the eight-factor test set forth in *Frisch's Restaurants v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982).  These "*Frisch's* factors," as they have come to be known, consist of (1) strength of the plaintiff's mark; (2) relatedness of the parties' goods or services; (3) similarity of the parties' marks; (4) evidence of actual confusion between the parties' marks; (5) marketing channels used by the parties; (6) likely degree of purchaser care in the relevant consumer group; (7) the defendant's intent in selecting the mark; and (8) likelihood that either party will expand its product lines.  *Id.* at 648; *see also Ga.-Pac. Consumer Prods. LP v. Four-U-Packaging, Inc.*, 701 F.3d 1093, 1100-01 (6th Cir. 2012).

While these factors are a guide to determine whether confusion is likely, Heaven Hill does not need to show all or even most of the factors to prevail on its claim.  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1186 (6th Cir. 1988); *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991) ("Each case presents its own complex set

of circumstances and not all of these factors may be particularly helpful in any given case."). "The 'ultimate question [is] whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'"  *Ohio State Univ. v. Thomas,* 738 F. Supp. 2d 738, 749 (S.D. Ohio 2010) (citations omitted).  Here, both scientific survey evidence and common sense answer that question with a resounding "yes."

> ### *Frisch's Factor No. 1:*        HEAVEN HILL Is a Very Strong Mark in Connection with Whiskey.

The stronger a trademark, the broader the scope of protection it enjoys.  As the Sixth Circuit recently noted, "[t]he stronger a mark is, the greater the risk of confusion."  *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016) (citing *Homeowners*, 931 F.2d at 1107; *see also Champions Golf Club, Inc. v. Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996).  A strong mark "casts a long shadow which competitors must avoid."  *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992) (underline added).  Accordingly, "the 'most important *Frisch's* factors are similarity and strength of the mark."  *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (quoting *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002)).

To determine the strength of a mark, courts in the Sixth Circuit (and others) first look at two separate components:  (1) "conceptual strength," which concerns the mark's distinctiveness, and (2) "commercial strength," which is the degree of recognition in the marketplace.  *Butler v. Hotel Cal., Inc.*, 106 F. Supp. 3d 899, 906 (N.D. Ohio 2015) (citing *Homeowners*, 931 F.2d at 1107).  A mark can be conceptually strong or commercially strong, but a mark that is both conceptually strong and commercially strong is the strongest mark.  *See Maker's Mark*, 679 F.3d at 419-20.

(a)       HEAVEN HILL Is a Conceptually Strong Mark.

Conceptual strength evaluates a term on the spectrum of distinctiveness:  Is a mark generic, descriptive, suggestive, or arbitrary/fanciful?  *See DeGidio v. West Grp. Corp.*, 355 F.3d 506, 510 (6th Cir. 2004).  Generic terms, which name the good or service, can never be protected as trademarks.  *See Champions Golf*, 78 F.3d at 1117 ("aspirin," "escalator," and "light beer" are generic and not protectable).  Descriptive terms often describe the goods or services and therefore are only protected as trademarks if they have acquired secondary meaning.  *See id.* (BEST, SUPERIOR, and PREFERRED are examples of descriptive marks).  Suggestive terms require a consumer to make a connection between the term and the goods or services and do not require secondary meaning to be protected as a trademark.  *See id.*  (for instance, CITIBANK for a bank connotes an urban or modern bank, and GOLIATH for wood pencils connotes a large size).  Arbitrary or fanciful terms, such as terms entirely unrelated to the goods or services or coined terms, are the strongest marks.  *See id.*  (CAMEL cigarettes or APPLE computers are arbitrary or fanciful terms).  The HEAVEN HILL Mark is conceptually strong in regards to whiskey, as the words "HEAVEN' and "HILL" are entirely unrelated to any component or characteristic of whiskey.  The Mark is truly arbitrary, and therefore is as conceptually strong as the APPLE mark is for computers.

(b)       HEAVEN HILL Is a Commercially Strong Mark.

Commercial strength evaluates public recognition of a mark—"the extent to which people associate the mark with the product it announces." *Kibler*, 843 F.3d at 1074.  In the Sixth Circuit, a trademark's "commercial strength" is determined through (a) direct consumer testimony; (b) consumer surveys; (c) exclusivity, length, and manner of use; (d) amount and manner of advertising; (e) amount of sales and number of customers; (f) established place in the

market; or (g) proof of international copying.  *See DeGidio*, 355 F.3d at 513 (citing *Mktg. Displays, Inc. v. TrafFix Devices, Inc.*, 200 F.3d 929, 937 (6th Cir. 1999), *rev'd on other grounds*, 532 U.S. 23 (2001)).

The HEAVEN HILL Mark is commercially strong for numerous reasons. First and foremost, Heaven Hill has continuously and exclusively used the HEAVEN HILL Mark for over eighty years in connection with the sale of whiskey, bourbon, and other distilled spirits. [Ex. 1, Shapira Decl., ¶ 32]. In fact, the HEAVEN HILL Mark has been a consistent presence on the whiskey shelves of liquor stores since those shelves were first installed in the 1930s. [*Id.* at ¶ 33]. Heaven Hill has also expended substantial time, money, and resources marketing, advertising, and promoting the HEAVEN HILL Mark through use of various media, including print, podcast, and internet; social media marketing; trade show booth and event activation; production and dissemination of collateral, including printed materials and promotional items; video production; and distributor incentives. [*Id.* at ¶ 34].

In the last five years, Heaven Hill has expended in excess of $7,500,000 marketing, advertising, and promoting distilled spirits and whiskeys marketed under the Heaven Hill umbrella. [*Id.* at ¶ 35]. More than $3,600,000 of this amount was spent on HEAVEN HILL-branded distilled spirits and whiskeys, including more than $600,000 on HEAVEN HILL-branded whiskeys and bourbons. [*Id.*]. These numbers do not include the marketing, sales, and advertising for the visitor center, distillery, and other brands within Heaven Hill's portfolio. [*Id.* at ¶ 36]. Moreover, in the last five years, Heaven Hill has sold more than 830,000 nine (9) liter equivalent cases HEAVEN HILL-branded whiskeys and bourbons, and has sold more than 3.7

million nine (9) liter equivalent cases HEAVEN HILL-branded distilled spirits.  [*Id.* at ¶ 37].[5]

Heaven Hill sells HEAVEN HILL-branded whiskey in all fifty states.  [*Id.* at ¶ 16].

Further, Heaven Hill provides retail store services, and operates visitor centers and distilleries, under the HEAVEN HILL Mark.  [*Id.* at ¶ 39].  The Heaven Hill EVAN WILLIAMS BOURBON EXPERIENCE® in Downtown Louisville is visited by more than 100,000 visitors a year, while the Heaven Hill Bourbon Heritage Center in Bardstown—a stop on the wildly successful Kentucky "Bourbon Trail"—receives approximately 65,000 annual visitors a year, which include visitors from every state in the nation.  [*Id.* at ¶ 39].  Pictures from the Heaven Hill Bourbon Heritage Center are below:



---

[5] Traditionally, the most common form of shipping carton in the distilled spirits trade has been a carton with twelve (12) 750 ml bottles—nine (9) liters of spirits.  The trade has therefore adopted "nine (9) liters equivalent cases" as the standard unit of measure for reporting product volume. Thus, shipments of cartons containing a different volume of spirits are reported as the equivalent volume of nine (9) liter cases.  [*Id.* at ¶ 38].



[*Id.* at ¶ 40].

Heaven Hill also generates a large volume of website traffic, including more than 165,000 unique visitors to www.heavenhill.com with more than 750,000 page views and more than 230,000 unique visitors to www.heavenhilldistillery.com with more than 700,000 page views over the last year.  [*Id.* at ¶ 41].

Heaven Hill has also scrupulously and successfully enforced and protected its HEAVEN HILL Mark against past infringements through cease-and-desist letters, domain name enforcement actions, and litigation; engages a watch service for potentially infringing uses of it HEAVEN HILL Mark; and acts upon watch notices when it believes there is a likelihood of confusion.  [*Id.* at ¶ 42].   Accordingly, the HEAVEN HILL Mark is commercially strong.

      (c)    The Incontestability of the HEAVEN HILL Mark Confirms Its Strength.

A federal trademark registration becomes "incontestable" after five years of continuous use on or in connection with certain goods or services, provided certain conditions are met. *See* 15 U.S.C. § 1065. An "incontestable" mark not only is immune from challenge, it is presumed to be strong. *Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999). The HEAVEN HILL Mark now at issue is incontestable—and has been for decades. [Ex. 1 to Compl. [DN 1]]. Accordingly, the HEAVEN HILL Mark is not only strong as a matter of fact, it is also presumed strong as a result of its incontestability.

      (d)    There Is Little (If Any) Third-Party Use of the HEAVEN HILL Mark.

Extensive third-party uses of a trademark may substantially weaken the mark. *Maker's Mark*, 679 F.3d at 420. An absence of third-party uses, however, indicates the mark is strong. Here, there is evidently ***no*** third-party use of the HEAVEN as the name of a whiskey—that is until Heaven's Door popped onto the scene this summer. This is evidenced in part by trademark expert Kenneth B. Germain, who commissioned an extensive and inclusive "search report" looking for trademark registrations using HEAVEN HILL in connection with the sale of whiskey and other alcoholic beverages. [Exhibit 4 hereto, Expert Report of Kenneth B. Germain ("Germain Report"), ¶ 53]. The only "active" registrations in the distilled spirits space that included the word "heaven" were (a) WHEN HEAVEN & HELL COLLIDE for "distilled spirits, namely whisky and orchata-flavored rum," (b) HEAVENLY SPIRITS for "wine and spirits," and (c) TASTES LIKE HEAVEN. BURNS LIKE HELL. for whiskey. That is it. [*Id.* at ¶ 55]. Heaven Hill is generally aware of the names of whiskeys in the American market, and is unaware of ***any*** of these three names being used as the name of a whiskey. [Ex. 1, Shapira Decl., ¶ 44]. While the search report did locate a few instances of the use of HEAVEN in connection

with beer, neither Heaven Hill nor Heaven's Door are using their marks in connection with beer. [Ex. 4, Germain Report, ¶ 55]. There were no other "active" registrations of the word HEAVEN in connection with whiskey or distilled spirits, which further proves the strength of the HEAVEN HILL Mark. [*Id.* at ¶¶ 54-58].

        (e)    Trademark Expert Kenneth Germain Confirms That HEAVEN HILL Is a Very Strong Mark in Connection with Whiskey.

Based upon the evidence described above, Heaven Hill submits that its HEAVEN HILL Mark is strong when used in connection with whiskey. To test this, Heaven Hill sought the opinion of trademark expert Ken Germain of Cincinnati, Ohio. Mr. Germain was a Professor at the University of Kentucky School of Law from 1971 through 1986. [*Id.* at p. 1]. He also taught trademark and intellectual property law at the University of Cincinnati College of Law for 17 years, and taught trademark and intellectual property classes at the University of Dayton School of Law and Northern Kentucky University's Chase College of Law as well. [*Id.* at ¶ 1]. Mr. Germain is currently *of counsel* to a top intellectual property law firm in Cincinnati. [*Id.* at p. 1].

Mr. Germain reviewed all of the relevant evidence, and based thereon, concluded that the HEAVEN HILL Mark is a "very strong" mark as used in connection with whiskey. [*Id.* at ¶ 59]. In short, he concluded that the HEAVEN HILL Mark has all of the muscles that a trademark can have: It is (1) conceptually strong, (2) commercially strong, (3) incontestable, and (4) not used by third parties in any meaningful way. [*Id.* at ¶¶ 21-59]. Accordingly, the pivotal "strength of mark" *Frisch's* factor weighs heavily in favor of Heaven Hill.

***Frisch's Factor No. 2:***        **The Goods at Issue Are Directly Related and Competitive.**

If two parties with sufficiently similar marks compete directly in their goods or services then confusion is likely. *See Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 282 (6th Cir. 1997). Heaven Hill and Heaven's Door use their respective

marks in connection with whiskey—goods that are directly competitive.   This factor therefore weighs heavily in favor of Heaven Hill.

      ***Frisch's Factor No. 3:*        The Parties' Marks Are Similar.**

      In assessing similarity, "'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'"   *Maker's Mark*, 679 F.3d at 421 (quoting *Daddy's Junky*, 109 F.3d at 283).

      Here, the parties' respective marks both share an essentially identical and dominant first element—HEAVEN and HEAVEN'S—followed by a four-letter, one-syllable word—HILL and DOOR.  While marks must be compared in their entireties, marks that share a dominant element are more likely to be confused.  *See* McCarthy, *supra*, p. 8, § 23:44; *see also Daddy's Junky Music Stores*, 109 F.3d at 284 n.4.  These shared elements, used in connection with identical products, create a likelihood of confusion.

      The situation this case presents to the Court is very similar to the situation presented to the Federal Circuit in *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369 (Fed. Cir. 2005).  In *Veuve Clicquot*, the vintner who owned the "VEUVE CLICQUOT" mark (and similar marks incorporating that mark), and marketed a well-known champagne by that name, contested a competitor's use of the mark "VEUVE ROYALE" for a new sparkling wine on grounds that the marks were confusingly similar.  *Id.* at 1370-71. Specifically, the owner of the senior "VEUVE CLICQUOT" Mark argued that "VEUVE" was the prominent feature of its mark, and that "VEUVE CLICQUOT" and "VEUVE ROYALE" were sufficiently similar to cause confusion.  *Id.*  The Federal Circuit agreed, upholding the Trademark Trial and Appeal Board's ("TTAB's") finding that the marks "were more similar than

dissimilar in their overall commercial impression." *Id.* at 1371.   The same goes here: "HEAVEN" is the prominent feature of the HEAVEN HILL Mark, and HEAVEN HILL and HEAVEN'S DOOR are similar enough to cause confusion to a consumer standing in front of a whiskey shelf in a liquor store.   This is borne out by the Poret Survey results.   [Ex. 3, Poret Report, p. 4 *et seq.*].   Accordingly, this *Frisch's* factor also weighs in favor of Heaven Hill.

**_Frisch's Factor No. 4:_**          **Actual Confusion Between the Marks.**

"Actual confusion" occurs when an actual consumer is confused about the source of goods or services because of similarity between two marks.   While evidence of actual confusion is "'undoubtedly the best evidence of likelihood of confusion,'" it is very difficult to obtain. *See Daddy's Junky*, 109 F.3d at 284 (citation omitted).   "Due to the difficulty of securing evidence of actual confusion, a lack of such evidence is rarely significant, and the factor of actual confusion 'is weighted heavily only when there is evidence of past confusion, or perhaps, when the particular circumstances indicate such evidence should have been available.'" *Id.* (citations omitted); *see also Maker's Mark*, 679 F.3d at 422 (stating that lack of actual confusion evidence is rarely significant and especially where the accused product was sold for a short time and in limited quantities, it is reasonable that no evidence of actual confusion was available).

Although evidence of actual confusion is notoriously difficult to procure, particularly at the preliminary injunction stage, an expert survey report is relevant and admissible as to the existence of likelihood of confusion, as well as a useful indicator of the potential for actual confusion. *See Daddy's Junky*, 109 F.3d at 284; 6 McCarthy, *supra* p. 8, § 32:158 (trademark surveys admissible as evidence in trademark and unfair competition cases); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1360 (9th Cir. 1985) (survey evidence may establish actual confusion).   "Both trademark validity and infringement turn largely on factual issues of customer

perception. . . . Survey evidence can shed light on this and similar issues."  6 McCarthy, *supra* p. 8, § 32:158.

Therefore, Heaven Hill commissioned Hal Poret to perform a scientific survey to test whether Heaven's Door's use of the Heaven's Door name for whiskey would create a likelihood of confusion with the Heaven Hill.  The results of the survey, which are attached as Exhibit 3 hereto, are unmistakable:  There is a "high likelihood of confusion" between the Heaven Hill name and the Heaven's Door name.  [Ex. 3, Poret Report, p. 4 *et seq.*].  The net confusion rate of 39% over and above the control means that nearly 4 out of 10 consumers who walk into a liquor store to purchase American whiskey, and view Heaven Hill's whiskey, followed by Heaven's Door's whiskey, will associate the Heaven's Door whiskey with Heaven Hill. [*Id.*].   This confirms the likelihood that a significant number of consumers will experience actual confusion if these products are allowed to continue to co-exist in the marketplace as they do now.  *See supra* pp. 8-9 (collecting authority on survey results).  Accordingly, this factor also weighs in favor of Heaven Hill.

### *Frisch's Factor No. 5:*        **The Parties Use Identical Marketing Channels.**

Where marketing methods used to promote the products at issue are substantially similar, the likelihood of confusion among the products is higher.  *Frisch's*, 670 F.2d at 648.  Here, the marketing methods used by Heaven Hill and Heaven's Door are virtually identical due to the fact that alcoholic beverage sales in the United States are subject to a three-tier distribution system, which forces alcoholic beverages into the same general marketing and trade channels.  *Sazerac Co. v. Fetzer Vineyards, Inc.*, 265 F. Supp. 3d 1013, 1021 (N.D. Cal. 2017); *see also JL Beverage Co. v. Beam, Inc.*, 899 F. Supp. 2d 991, 1006 (D. Nev. 2012); *Roederer v. J. Garcia*

*Carrion, S.A.*, 732 F. Supp. 2d 836, 841 (D. Minn. 2010).  Accordingly, this *Frisch's* factor also weighs strongly in favor of Heaven Hill.

> ### *Frisch's Factor No. 6:*      **Likely Degree of Purchaser Care.**

The next *Frisch's* factor requires the Court to determine the likely degree of purchaser care.  "For example, home buyers will display a high degree of care when selecting their real estate brokers, whereas consumers of fast-food are unlikely to employ much care during their purchases."  *Daddy's Junky*, 109 F.3d at 285 (citations omitted).  "'Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution.'"  *Id.* (quoting *Homeowners*, 109 F.3d at 1111).  The less degree of care a purchaser uses, the greater likelihood of confusion.  *Id.*

Here, the goods at issue are bottles of whiskey stocked on a standard, everyday liquor store shelves.  Again, the situation presented here is very similar to the one presented in *Veuve Clicquot*, where the vintner who made the well-known "VEUVE CLICQUOT" champagne contested a competitor's registration and use of the mark "VEUVE ROYALE" for a new sparkling wine.  The defendant argued that purchasers of "VEUVE CLICQUOT" were sophisticated, and would not confuse the defendant's cheaper "VEUVE ROYALE" sparkling wine with the maker of the more expensive "VEUVE CLICQUOT" champagne.  *Veuve Clicquot*, 396 F.3d at 1376.  The Federal Circuit disagreed, holding that the purchaser confusion element was "neutral, at best," for the defendant because "champagne and sparkling wines are not necessarily expensive goods which are always purchased by sophisticated purchasers who exercise a great deal of care in making their purchases."  *Id.*  The court correctly noted that champagne buyers run the gamut, as "general consumers, not just connoisseurs, occasionally

purchase champagne or sparkling wines on celebratory occasions, without care or prior knowledge." *Id.*

Further, the Federal Circuit noted that "even more sophisticated purchasers might be aware that champagne houses offer both [champagnes and cheaper sparkling wines] under similar marks, and could easily conclude that VEUVE ROYALE was Veuve Clicquot's sparkling wine." *Id.* The Court therefore rejected the argument that the different price points for VEUVE CLICQUOT and VEUVE ROYALE would prevent confusion of even sophisticated purchasers. *Id.*

Whiskey and bourbon—like champagne and sparkling wine—are not just purchased by connoisseurs. Both the expensive and less expensive brands are purchased by people from all levels of sophistication. While some consumers may exercise a high degree of care or sophistication when grabbing a bottle of whiskey to take home, many do not. Accordingly, this *Frisch's* factor is either neutral or weighs in favor of Heaven Hill.

> ### *Frisch's Factor No. 7:*     **Heaven's Door's Intent in Selecting its Mark.**

At the time Heaven's Door selected its mark, it would have been virtually impossible for it to have been unaware of Heaven Hill's longstanding and good reputation in the industry, and Heaven Hill's efforts to build and promote the goodwill associated with its HEAVEN HILL Mark. Any minimal trademark search, or other due diligence conducted by Heaven's Door in advance of selecting its mark, would have brought the incontestable HEAVEN HILL Mark to Heaven's Door's attention. The HEAVEN HILL Mark is a strong mark, meaning that it "casts a long shadow which competitors must avoid." *Kenner*, 963 F.2d at 353. Heaven's Door, however, chose to place its new whiskeys squarely inside of that long shadow, and its decision to do so was almost certainly intentional. But even if it were not, "'intent is an issue whose

resolution may benefit only the cause of the senior user, not of an alleged infringer.'" *Maker's Mark*, 679 F.3d at 424 (citations omitted).  As a result, this factor weighs in favor of Heaven Hill, or is at worst neutral.

> ### *Frisch's Factor No. 8:*        **Expansion of Product Lines.**

In this case, Heaven Hill's and Heaven's Door's products are directly competing whiskeys and bourbons.  The Sixth Circuit holds that in such instances there "is no need for discussion of this factor."  *Little Caesar Enterprises, Inc. v. Pizza Caesar, Inc.,* 834 F.2d 568, 572 (6th Cir. 1987).

That said, to the extent Heaven's Door tries to distinguish its whiskeys from Heaven Hill's on the basis of price—like the infringer tried to do in *Veuve Clicquot*—such an effort would instantly fail.  Heaven Hill's bourbons and whiskeys can be found at different price points from entry level to luxury pricing.  [Ex. 1, Shapira Decl., ¶ 45].  For instance, while a 750 milliliter bottle of HEAVEN HILL White Label 100 Proof Bourbon generally retails for $12.99, the same size bottle of the current release of HEAVEN HILL Select Stock generally retails at $199.99.  [*Id.* at ¶ 46].

A visit to any liquor store will show that this is not an uncommon practice in the whiskey industry (or alcohol industry in general).  [*See id.* at ¶ 47].  Many distilleries offer different whiskeys, at different price points, under similar marks.  [*Id.*].  For instance, a 750 milliliter bottle of Jack Daniel's Distillery's "Jack Daniels Old No. 7" Tennessee Whiskey sells for approximately $17.99.[6]  That same distillery markets a more expensive "Gentlemen Jack"

---

[6] *See* Exhibit 5, screenshot of https://www.totalwine.com/spirits/american-whiskey/tennessee-whiskey/jack-daniels-black/p/1782750?s=2101&igrules=true, showing price of referenced Jack Daniel's product at a Louisville, Kentucky liquor store on August 17, 2018.

Tennessee Whiskey, which sells for approximately $26.99 for a 750 milliliter bottle.[7]   It also

markets "Jack Daniels—Sinatra Edition" Tennessee Whiskey, in honor of Frank Sinatra, for

approximately $159.99 for a one liter bottle.[8]

Sophisticated whiskey consumers will be aware of this common practice, and may very

well conclude that HEAVEN'S DOOR is Heaven Hill's entrant at a different price point—

precisely the confusion the Federal Circuit recognized could result from a sophisticated

champagne consumer seeing a sparkling wine with "VEUVE" as the first word of its name.

*Veuve Clicquot*, 396 F.3d at 1376.  And, to the extent Heaven Hill is not already in a particular

niche on the whiskey shelf, it is likely to expand into it should doing so make economic sense,[9]

and it is entitled to do so without there being any confusion:  " '[A] strong possibility that either

party will expand his business to compete with the other or be marketed to the same consumers

will weigh in favor of finding that the present use is infringing.'"  *Daddy's Junky*, 109 F.3d at

287 (quoting *Homeowners*, 931 F.2d at 1112).  Though it need not be considered, this final

*Frisch's* factor weighs in Heaven Hill's favor as well.

### The *Frisch's Factors*, Taken Together, Weigh Strongly in Favor of Heaven Hill.

Cases like this are why trademark laws exist.  In the alcoholic beverages industry,

perhaps more than any other, ***trademarks matter***.  If you were to strip the labels and trade dress

off of all of the bottles in a whiskey aisle, it would be impossible for a customer to tell what they

---

[7]  *See*  Exhibit  5,  https://www.totalwine.com/spirits/american-whiskey/tennessee-whiskey/jack-daniels-gentleman-jack/p/1783750?s=2101&igrules=true,  showing  price  of  referenced  Jack Daniel's product at a Louisville, Kentucky liquor store on August 17, 2018.

[8]  *See*  Exhibit  5,  https://www.totalwine.com/spirits/american-whiskey/tennessee-whiskey/jack-daniels-sinatra-select-tennessee-whiskey/p/134628010?s=2101&igrules=true,  showing  price  of referenced Jack Daniel's product at a Louisville, Kentucky liquor store on August 17, 2018.

[9] [Ex. 1, Shapira Decl., ¶ 48].

were buying, other than brown liquid.  It is trademarks *alone* that allow a whiskey buyer to differentiate between those liquids and thus make their purchase.  Accordingly, confusion on the whiskey shelf should not be tolerated—just like it is not tolerated on the sparkling wine shelf.

And it certainly should not be tolerated in connection with a trademark as strong as Heaven Hill's.  The HEAVEN HILL Mark is not just a registration in a federal records book.  It is also the cornerstone of a family-owned Kentucky business that, through hard work and quality products, expanded from a tiny operation on a Nelson County family farm into a distiller that currently employs over 600 people, all of whom do their part to make and distribute HEAVEN HILL whiskeys, bourbons, and distilled spirits to people who enjoy them nationwide (and worldwide).  The HEAVEN HILL Mark is the epitome of a very strong mark, and it is entitled to broad and robust protection.

Heaven Hill welcomes competition from any company who makes and sells whiskeys responsibly.  What it does not welcome is confusion.  Heaven Hill has offered substantial evidence showing that the HEAVEN'S DOOR Mark is confusingly similar to the strong HEAVEN HILL Mark, which has been ever-present on whiskey retailer's shelves since 1937.[10] Accordingly, Heaven Hill is likely to prevail in this case, just as the owner of the strong VEUVE CLICQUOT mark prevailed in its effort to stop a competitor from causing confusion by using the VEUVE ROYALE mark.

## II.   HEAVEN HILL WILL SUFFER IRREPARABLE HARM WITHOUT THE REQUESTED INJUNCTION.

A party seeking an injunction must show that it will suffer irreparable injury without the injunction.  In the trademark context, this requirement is interpreted liberally.  *See Lorillard*

---

[10] Heaven Hill started making whiskey virtually as soon as it was allowed to do so after the end of Prohibition.  Heaven Hill, however, did not actually sell any of its whiskey until 1937 for one very good reason—the whiskey had to age.  [Ex. 1, Shapira Decl., ¶ 9].

*Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006).  The Sixth Circuit has unequivocally held that "irreparable harm is *presumed* from defendant[']s infringement of plaintiff's mark."  *DaimlerChrysler v. The Net Inc.*, 388 F.3d 201, 208 (6th Cir. 2004) (citations omitted) (emphasis added).  "The law of this Circuit holds that no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases."  *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir. 1999) (citing *Wynn Oil Co. v. Am. Way Serv. Corp.,* 943 F.2d 595, 608 (6th Cir. 1991)).  Further, "once a moving party has demonstrated a likelihood of confusion, a finding of irreparable injury ordinarily follows."  *Ohio State*, 738 F. Supp.2d at 755.

"The irreparable injury flows both from the potential difficulty of proof of plaintiff's damages, and also from the impairment of intangible values."  *Wynn*, 943 F.2d at 608 (internal quotation marks omitted) (citations omitted); *Lorillard Tobacco*, 453 F.3d at 382 (irreparable injury "ordinarily flows when a likelihood of confusion or possible risk to reputation appears" (internal quotation marks omitted) (citations omitted)).  Further, where a defendant is unlawfully infringing upon a trademark, irreparable injury follows from the damage to a plaintiff's reputation and the development of goodwill in its mark.  *See DaimlerChrysler*, 388 F.3d at 208.  A court may also consider the potential loss of control over the quality of goods associated with the plaintiff's mark and the risk of damage to the plaintiff's reputation and mark.  *See Woodroast Sys., Inc. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 918 (D. Minn. 1992), *aff'd* 994 F.2d 844 (8th Cir. 1993).  The consequences of trademark infringement and unfair competition and the attendant loss of goodwill and injury to reputation along with control over the nature and quality of the goods are intangibles which cannot later be compensated by an award of money damages.

Heaven Hill has spent its entire lifetime as a company developing its brand and its reputation as a premier marketer and producer of whiskey, bourbon, and other distilled spirits.  It has expended substantial time, money, and resources marketing, advertising, and promoting its goods and services sold under the HEAVEN HILL Mark, as well as substantial time, money, and resources in protecting and enforcing its trademarks.  [Ex. 1, Shapira Decl., ¶¶ 32-44].  By demonstrating Heaven's Door's infringement of the HEAVEN HILL Mark, Heaven Hill has fully satisfied the presumption of irreparable harm should Heaven's Door not be enjoined from infringing upon the HEAVEN HILL Mark.

## III.   THE HARM TO HEAVEN HILL GREATLY OUTWEIGHS ANY POSSIBLE HARM TO HEAVEN'S DOOR.

Harm caused to apparent infringers is not entitled to consideration.  *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1461 (S.D. Ohio 1990).  "If the plaintiff alleging trademark infringement can show a likelihood of success, the 'harm to others' factor of the preliminary injunction standard would normally favor the plaintiff as well."  *Id*. at 1462.  The threatened injury to Heaven Hill therefore far outweighs whatever harm the issuance of an injunction may cause Heaven's Door.

The relief sought by Heaven Hill merely prohibits Heaven's Door from doing what it should not be doing in the first place—using a trademark that is confusingly similar to the trademark of another.  "Where the harm to an alleged infringer from a preliminary injunction is self-inflicted, courts typically find that such harm is a natural consequence of infringing activity that does not weigh against issuance of an injunction."  *Anderson v. TOL, Inc.,* 927 F. Supp. 2d 475, 488 (M.D. Tenn. 2013).  Any harm to Heaven's Door is self-inflicted, as Heaven's Door knew, or certainly should have known, of Heaven Hill's long-standing rights in the HEAVEN HILL Mark.  *See Papa John's Int'l, Inc. v. Specktacular Pizza, Inc.*, No. 3:05-cv-515, 2005 WL

3132337, at *5 (W.D. Ky. Nov. 21, 2005); *see also KFC Corp. v. Goldey*, 714 F. Supp. 264, 267 (W.D. Ky. 1989) ("As to the threatened harm to plaintiff compared with the threatened harm to the defendant, the courts have usually held that where the plaintiff is an authorized trademark holder and the defendant is improperly using the trademark, then the threatened harm to the trademark owner outweighs the threatened harm to the defendant.").

Furthermore, when a plaintiff has made a substantial investment of time and money in its mark as opposed to the investment by the infringer, the balance of hardships tips in favor of the plaintiff. *See Woodroast*, 793 F. Supp. at 919. Here, Heaven Hill has been actively building up the goodwill in its HEAVEN HILL Mark since the Depression, including expending great financial resources in establishing and growing recognition of its HEAVEN HILL Mark. [Ex. 1, Shapira Decl., ¶¶ 32-44].

In stark contrast, Heaven's Door first placed its products on the shelf weeks ago, and is only selling in a handful of launch markets. Moreover, Heaven's Door's website states that its products are "sold out online," and the company is therefore not fulfilling orders at this time. [Exhibit 6 hereto].[11] Under such circumstances, the hardships imposed upon Heaven's Door by precluding it from using the infringing HEAVEN'S DOOR Mark will have only a minor impact on its business and will cause only monetary loss. Heaven's Door's business and products under the HEAVEN'S DOOR Mark are new to the market and therefore will require less time and resources to rebrand as compared to Heaven Hill, whose whiskeys and bourbons have been around for literally as long as anyone could legally make them.

---

[11] Interestingly, Heaven's Door does not list Kentucky as a state where its whiskeys may be available at a local retailer, even though Heaven's Door has made its whiskeys available for sale at Kentucky retailers.

Under these circumstances, the balancing of hardships greatly favors Heaven Hill, meaning that it has more than fulfilled the third prong of the injunction test.

## IV.     THE INJUNCTION SERVES THE PUBLIC INTEREST.

The fourth and final factor to be considered in a motion for preliminary injunctive relief is the interest of the public.  Unlike other types of preliminary injunction matters, in a trademark infringement matter, "a third party, the consuming public, is present and its interests are paramount."  *See* 1 McCarthy, *supra* p. 8, § 2:22 (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 274 (7th Cir. 1976)).  When a trademark is infringed, what is actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control its product's reputation.  *Id.*  As a result, public policy concerns often "weigh in favor of preliminary injunctive relief because an injunction would halt confusion in the marketplace."  *Ohio State*, 738 F. Supp. 2d at 756-57.  Here, Heaven Hill's trademark is being infringed, meaning the public's right to be free of confusion is also being infringed.

## CONCLUSION

Confusion is the enemy of fairness and competition.  Perhaps nowhere does that maxim hold more true than the whiskey shelf of a liquor store, where the only thing differentiating the sealed bottles of brown liquid are the trademarks thereon.  Here, Heaven Hill has offered sufficient evidence to show that the new HEAVEN'S DOOR Mark is confusingly similar to the strong HEAVEN HILL Mark, which has been reliably and consistently found on the whiskey shelves for as long as American whiskey has been sold legally in this country.  Heaven Hill asks this Court to enter a temporary injunction requiring Heaven's Door to do nothing more than remove itself from the shadow that the strong HEAVEN HILL Mark has long cast.

Respectfully submitted,

*/s/  Christopher W. Brooker*
Christopher W. Brooker
Matthew A. Williams
Sean G. Williamson
Julie A. Laemmle
WYATT, TARRANT & COMBS, LLP
500 West Jefferson Street, Suite 2800
Louisville, Kentucky  40202-2898
502.589.5235
cbrooker@wyattfirm.com
mwilliams@wyattfirm.com
swilliamson@wyattfirm.com
jlaemmle@wyattfirm.com

**Counsel for Plaintiff, Heaven Hill
Distilleries, Inc.**

## CERTIFICATE OF SERVICE

I also hereby certify that on **August 17, 2018**, I sent a copy of this motion via certified mail, return-receipt requested, to the following:

Corporation Service Company
Service of Process Agent for Heaven's Door, LLC
251 Little Falls Drive
Wilmington, Delaware  19808

*/s/  Christopher W. Brooker*
**One of Counsel for Plaintiff**

61748711.10

31